[Cite as *In re J.S.*, 2019-Ohio-1023.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: J.S.

:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 28190

Trial Court Case No. 2016-5976

(Appeal from Common Pleas Court –
Juvenile Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of March, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Appellee

SARA M. BARRY, Atty. Reg. No. 0090909, 1139 Holly Avenue, Dayton, Ohio 45410
        Attorney for Appellant

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** This matter is before the Court on Father's October 29, 2018 Notice of Appeal. Father appeals from the juvenile court's October 15, 2018 judgment wherein it granted Montgomery County Children Services ("MCCS") permanent custody of Father's child, J.S.[1] We hereby affirm the judgment of the trial court.

**{¶ 2}** J.S. was born in May 2015. On September 26, 2016, MCCS filed a complaint alleging that J.S. was neglected and dependent. The complaint provided that MCCS received a referral about Father and Mother exposing J.S. to domestic violence. The complaint provided that "Mother admitted that Father punched her in the chest and pulled her hair during a DV incident" in January 2016, while their child was present, that Father had a history of domestic violence, and that Father was convicted of an enhanced charge of DV in 2011 because he had a prior conviction. The complaint stated that Father had completed the STOP The Violence Program on two separate occasions, but he "continued to have domestic incidents with his previous wife. According to the complaint, on May 20, 2016, Mother filed domestic violence charges against Father, but she eventually dropped the charges. The complaint also alleged that Mother and Father were unable to address J.S.'s "special needs."

**{¶ 3}** The complaint stated that a case plan was developed for both parents with several recommendations. The complaint provided in part as follows:

> Father completed a mental health and substance abuse assessment

---

[1] Mother was also involved in the trial court proceedings, but she is not a party to this appeal.

in March 2016 with South Community. Father has previously received services from South Community and he continues to attend appointments and takes his prescribed medications. Father reports that he is a self-employed business owner but his income is not entirely reliable as his profits vary from month to month.

Parents obtained suitable housing in March 2016, a one bedroom apartment in Moraine. The apartment has working utilities and the environment is free from safety hazards for the Child's well-being.

Prior to MCCS involvement the parents failed to recognize that their child had special needs. The Child is unable to sit up on his own; unable to crawl; and unable to walk. * * * MCCS referred the Child to PACE at Dayton Children's Hospital for weekly sessions to assist with his developmental delays. Dayton Children's Hospital determined that the child is globally delayed.

The Child recently received a diagnosis of Cerebral Palsy. The Caseworker does not believe that the parents will be able to meet the Child's needs in light of his recent diagnosis.

{¶ 4} The complaint further stated that, on September 23, 2016, Father reported to MCCS that he was leaving the family home, that he did not think that J.S. was safe alone with Mother, and that the child needed to be removed. That same day, J.S. was removed from Mother's custody and placed in the emergency custody of MCCS. On September 26, 2016, following a shelter care hearing, the Magistrate issued an order granting interim temporary custody to MCCS.

**{¶ 5}** On October 5, 2016, an amended complaint was filed by MCCS. On October 19, 2016, the guardian ad litem ("GAL") issued a report recommending that "disposition should be temporary custody to MCCS." On October 28, 2016, following an adjudication hearing, the magistrate adjudicated J.S. as a dependent and neglected child and scheduled a hearing for December 20, 2016. On November 17, 2016, Father filed a "Motion for Definite Parenting Schedule."

**{¶ 6}** On December 20, 2016, after the hearing, a Magistrate's Decision and Judge's Order was issued, which found the parents' case plan objectives were not complete and granted temporary custody to MCCS.

**{¶ 7}** On February 13, 2017, Father filed a "Multi-Branch Motion" requesting increased parenting time, the appointment of a "new/different psychologist * * * to perform the requested psychological evaluation in this matter," and legal custody of J.S. On February 21, 2017, Father filed a motion for the appointment of a new guardian ad litem.

**{¶ 8}** On April 13, 2017, the GAL filed a report and recommendation. The report provided in part:

> * * * This child is so vulnerable and "frail" that only a committed and resourceful caretaker would have a chance for success. These parents are not capable. [Father] has a criminal record that includes failure to comply with the police, many theft charges and convictions, failure to appear, attempted assault, multiple domestic violence charges, and aggravated menacing. [Father] is not unfamiliar with the prison system. * * *. Per [Father's] attempts to control the legal process and allegations of his abusing [Mother], awarding him custody of this frail child ever is unlikely.

* * *

{¶ 9} Also on April 13, 2017, a Magistrate's Decision and Judge's Order was filed following a hearing. The order increased Father's parenting time to three hours weekly at MCCS; Father's withdrew his remaining motions.

{¶ 10} On May 24, 2017, Father filed a motion for an independent "psychological/custody" evaluation of the parents and the child. The court granted Father's motion on June 28, 2017.

{¶ 11} On July 26, 2017, MCCS filed a motion for permanent custody of J.S. The affidavit of Patrice Washington, a caseworker at MCCS, was attached. The affidavit provided in part as follows:

> * * * Father was previously arrested, convicted, and incarcerated for six months for domestic violence charges. Father also has a lengthy history of substance abuse and mental health issue[s]. Father does have housing at this time. Father reports that he is self-employed, but he has not provided verification of income. Father was asked to complete a batterer's program; he was engaged with the August Program but withdrew before completing. On May 17, 2017, Father was arrested for a domestic violence incident with Mother. Father completed a parenting and psychological assessment. The assessment provided several treatment recommendations, but Father has not engaged in any yet. Father did complete parenting classes at MCCS.

The affidavit further concluded that the parents were "unfit/unable to care for the child."

**{¶ 12}** On August 28, 2017, the GAL filed a report recommending that permanent custody be awarded to MCCS. On August 30, 2017, an annual hearing and pretrial occurred, but neither parent attended the hearing. The caseworker reported that both parents had recently been incarcerated in West Virginia. The court scheduled a dispositional hearing for November 28, 2017.

**{¶ 13}** The dispositional hearing began on November 28, 2017 and continued on February 13, 2018. On November 28, Father also filed a motion for legal custody, and the GAL filed a supplemental report and recommendation. The GAL's supplemental report stated that J.S. had been in a new foster home for several weeks and that his foster mother wanted to adopt him. The GAL again recommended permanent custody in favor of MCCS. On February 6, 2018, the GAL file a second supplemental report and recommendation, which "emphatically" recommended that permanent custody be granted to MCCS "forthwith."

**{¶ 14}** On the first day of the hearing, Dr. Richard Bromberg, a psychologist whose practice focused on assessment and therapy, was designated an expert in the field of clinical psychology. Bromberg testified that he evaluated Mother and Father. Bromberg testified that Father has "seven kids from age 34 down to [J.S.'s] age." (J.S. was two years old at the time of the hearing.) Bromberg testified that he administered the Personality Assessment Inventory to Father, and that his responses were "[v]ery marginally valid" and "defensive"; the test revealed that Father "did not want to reveal to me or the Court that much information about himself. But what he did reveal indicated that there were issues related to mood and with substance use, and some severe personality problems that would suggest personality disorder."

{¶ 15} Bromberg also administered the Substance Abuse Subtle Screening Inventory to Father, and Father's responses were "[m]arginally" valid. According to Bromberg, Father "measured out as high probability of having a substance dependence disorder." Bromberg testified that he administered the Parenting Stress Index test to Father, and that his responses were "defensive * * * but * * * still within the range of being considered valid"; the test "revealed that [Father] did perceive some significant problems with [J.S.] in terms of hyperactivity." Bromberg stated that, when parents report that "they believe that their child is not reinforcing them as a parent enough, * * * we are concerned about the * * * possibility for neglect." Bromberg testified that he also administered the "Child Abuse Potential Inventory," and that Father's responses were "marginally valid"; "[o]n the lie score of that test, [Father] got a ten. The cut off score is seven. Anything seven or above would suggest that there is a tendency to not accurately be representing themselves." Bromberg stated that "because of the high lie score, ten, we can't determine whether he has any characteristics similar to known, active physical child abusers." Bromberg testified that Father "seemed to be of low average to average intellectual functioning." Bromberg testified that his findings were made to a reasonable degree to psychological and scientific certainty.

{¶ 16} Bromberg also conducted a clinical interview of Father. Bromberg testified that Father was diagnosed with impulse disorder, personality disorder, and "some substance use disorders" related to cannabis and cocaine, as well as "amphetamine disorder" to a reasonable degree of scientific certainty. He stated that the disorders could affect Father's ability to parent. According to Bromberg, "the particular features that were seen most prominent, one of which was avoidant, would suggest the potential for neglect.

The feature of narcissistic [sic] would also suggest the possibility for neglect, since priorities could certainly be not the best for the child." Bromberg testified that Father would need to spend significant time addressing his own issues, making it difficult to parent J.S. effectively.

{¶ 17} Bromberg testified that he determined Father's global assessment of functioning score to be forty. He explained that "we give a number between zero and a hundred. Zero meaning that a person would be a hundred percent psychologically impaired. A hundred meaning that a person would be zero percent psychologically impaired. A fifty would represent serious psychological impairment." Bromberg testified that "a forty would be very serious psychological impairment." Bromberg testified that Father had the "desire to parent his son," but did not "appear to be ready, would need to really put a lot of work in to be able to be reunited and be in independent care with his son in the future." According to Bromberg, Father's "motivation level did not appear to be great, in terms of his testing." Bromberg testified, "you have to be very aggressive over a long period of time to be able to do that." Bromberg testified that "[w]hen you're dealing with substance abuse, that's certainly a problem. * * * The most difficult problem in psychology to deal with is personality disorder, very, very hard to treat." He stated that "the impulse control disorder is going to take a lot of his time, if he really wants to work at it. You can't do it in just regular counseling. You have to actually do it with specialists in those areas."

{¶ 18} Bromberg testified that his treatment recommendations for Father included random drug testing for a period of 24 months; specialized personality disorder treatment over a period of 24 months; individual therapy, weekly, over a period of 24 months; and

anger management skills training. He also stated that Father should be "in some kind of a twelve step program, like AA or NA." Bromberg testified that Father "certainly reflected a lack of parenting skills. But I think he could understand it with education over a period of about twelve months." Bromberg testified that he was not advised that J.S. had special needs, and that "when you look at someone who is challenged somewhat psychologically or parentally in terms of their functioning, and there's also a special needs child, that adds a lot to the concerns."

{¶ 19} On cross examination by counsel for Father, Bromberg testified that if Father "applied himself and was very aggressive in his treatment, and did what he was recommended, there would be a chance that he would be able to improve himself to the point that he could seriously be considered for reunification." Bromberg testified as follows:

In all of my 47 years as a psychologist, I have never seen anybody effectively treated for personality disorder so that with the development of this treatment program in the last five years - - it was actually discovered in 1990, but it wasn't distributed to the rest of the country until about five years ago - - that now there is some hope. That there is a treatment program that's been put together with research behind it. And so that people do have a chance of getting better. * * *

{¶ 20} Bromberg testified that Father "showed some signs in his [Personality Assessment Inventory] * * * of not having the motivation in a treatment program. But if he applied himself and if he wanted to enough, commit himself on a long term basis, then he could do it."

{¶ 21} When asked on redirect examination how long of a period of time in treatment would be required to treat his personality disorder, Bromberg responded that "if he went into treatment with the specialized personality disorder treatment tomorrow, we would be looking at a minimum of eighteen months before we really could re-evaluate and be able to determine - - we would talk to his treatment provider, we would do some testing, we would be able to see. We would not do a re-evaluation before then." Bromberg stated that "if he applied - - stayed in treatment, and really committed to this for that period of time, there is a good chance that he could be re-evaluated and it could be positive. But he would need * * * a significant period of time in this treatment." Bromberg testified that Father would "be going to probably an hour and-a-half to two-hour group treatment once a week. And in addition, he would be going to individual therapies like what we know as counseling, probably by the same treatment provider. So that would be probably anywhere from two to three hours a week of an investment of time."

{¶ 22} On cross examination by the GAL regarding the treatment of personality disorder, the following exchange occurred:

Q. So - - so that's why there's just hope on the horizon, but no evidence that supports it?

A. There's hope. And there's pretty encouraging information that has come out of Oregon is where it was essentially developed, University of Oregon. And for some reason for, I'd say fifteen years, they kept that within a little campus town, and * * * then they commercialized it and sold the rights to it, just like everything else. * * *

Q. I've heard you testify that 24 months is a minimum - -

A. Yes.

Q. - - of treatment, but possibly longer?

A. Possibly lots longer. I mean, it's - - as much as five to ten years for some people that they've found that they've had to go much further than the 24 months. * * *

Q. And even then, you don't know if - - with any certainty of successful treatment, correct?

A. Right. We don't have the follow-ups to the remissions. There have been remissions, which means it's no longer symptomatic. But we * * * still haven't looked at those people who have remitted from the problem and five years later, because it's still so current.

{¶ 23} B.K., who was J.S.'s initial foster mother for 16-17 months, also testified at the hearing. She testified:

[J.S.] was very fragile when he came into our care. He was sixteen-months old. He could not sit up. He couldn't roll over. He had no use of his legs, really. He was not eating. Very fragile. Very, very fragile. His eyes were sunken, very gaunt. No vocabulary. * * * He just basically lied on the ground * * *. He did not know words. He didn't babble. * * *

{¶ 24} B.K. testified that "we immediately got a group of doctors together. We formed new plans for him. He started [physical therapy, occupational therapy]. We didn't start speech until much later, because they felt that his gross motor and eating needs were so big they didn't want to overwhelm him. So we had GI involved." B.K. stated that she learned that J.S. did not have cerebral palsy.

{¶ 25} B.K. testified that J.S. was sitting up after three weeks in her care, and that "the hardest part was eating." She stated that J.S. "didn't get hungry," and when he did eat, he would then vomit. B.K. testified that J.S. was hospitalized three times for an ear infection, "and the first thing he would do is he would stop eating. So he would get dehydrated and would have to go to the hospital." B.K. testified that J.S. "required constant attention, constant monitoring of calories, constant distractions while eating. It took about ten months * * * before we actually got him to be able to eat a meal successfully without having to do all these other things." B.K. testified that when he left her care, J.S. "was walking. He was starting to say words. He's happy. [J.S.] is a gentle soul. * * * The worrisome part of [J.S.] is he demands nothing. So if you don't feed him, he doesn't care. So you have to be on top of it and be proactive and know * * * what he's going to need and how to care for him. I would say he's very time consuming." B.K. testified that "meal time takes a long time. You have to be patient."

{¶ 26} When the hearing resumed on February 18, 2018, counsel for Father called Dr. Gordon Harris out of order. The court designated Harris as an expert in psychological services, and he had completed an evaluation of Father. Harris testified that he administered the MMPI-II RF and the Rorschach tests in the course of his evaluation, and that the "MMPI was almost entirely within normal limits. The only scale outside normal limits was activation, which involves energy level and things like that. [Father] has related to me that he did have an attention deficit/hyperactivity disorder, so that would not be unexpected." According to Harris, the "results of the Rorschach found [Father] to lack a well-defined coping style. Sometimes he will think things through, sometimes he works on the basis of impulse and instinct. He has difficulty [making] decisions. Sometimes *

* * he listens to his thoughts, and other times he works on feelings." Harris stated that "makes him somewhat unpredictable." Harris testified that Father "has difficulty with some of the demands of everyday living. And his major style for dealing with that is to try and keep stressful experiences out of his life, and disturbing thoughts out of his awareness." Harris testified that "when confronted with a higher level of stress, he can engage in unpredictable type behaviors."

{¶ 27} Harris further testified that Father had "some oppositional tendencies with anger and resentment towards people and authority in particular. He, therefore, may, at times, exhibit some poor judgment, particularly in relationships with people." Harris stated that Father had "a limited capacity to * * * identify with other people in his life" and was "insecure." "He lacks confidence in himself and his judgment. He can become defensive when his self-esteem or well-being is challenged." According to Harris, there "is some impairment of his reality testing, which leads him to misperceive events and form mistaken impressions of people and what their actions mean, which is a liability * * * in that he fails to anticipate the consequences of his actions and misconstrues what is appropriate behavior." Harris stated that Father's "inaccurate perceptions lead him to erroneous conclusions, and therefore, ill-advised actions, which undermine his judgment."

{¶ 28} Harris testified that Father "has a moderate amount of substance abusive ideations; thinks about things in a fairly inflexible manner; hangs on to his previous beliefs and resists reconsidering beliefs in light of new information, leading him to be * * * close-minded and inflexible." Harris stated that Father's "thinking may not be entirely logical or coherent, and his "poor judgment will likely interfere with his ability to function as a

parent. His inflexibility and disinclination to alter his own opinions of people and events will interfere with his functioning effectively as a parent," and affect his ability "to respond in an understanding and accepting way to the changing nature and demands of children as they grow." According to Harris's testimony, Father "is susceptible to becoming upset when forced to deal with ordinary stressors that most people manage comfortably, thus he will have limited skills in tolerating demands that children often make on their parents."

{¶ 29} When asked for treatment recommendations for Father, Harris responded as follows:

> First of all, I recommend that he be monitored by [MCCS], protective service division; that [J.S.] be enrolled in a program to deal with his developmental handicaps; that [Father] receive ongoing psychotherapy in relation to his personality problems, as well as to provide him with a supportive person to assist him in dealing with the stressors as they emerge. I suggested weekly for a period of 24 months, as long as the situation is being monitored by protective services. Random drug testing due to his history of drug abuse and that he continue or finish his enrollment in an anger management program.

Harris testified that with all of those services in place, Father and J.S. could have a successful relationship.

{¶ 30} On cross-examination by counsel for MCCS, Harris testified that J.S. "had some developmental problems, and [Father] had made no mention of that in all the presentation of the background or history * * *. He never mentioned that there were any such issues." Harris testified that this caused him concern, and that "if I had a child with

special needs, that would be a prominent thing in my description of the child. And I would certainly want people to know that I was addressing that." Harris stated that "there are times where [Father] does not get his priorities in order when it comes to dealing with situations." Referring to his treatment recommendations, Harris testified that if "those steps were in progress, he might be able to care for [J.S.]."

{¶ 31} Patrice Washington then testified on behalf of MCCS. She stated that she was employed as an investigative caseworker at MCCS from June 2013 to October 2017, and that she was assigned to J.S.'s case from September 19, 2016 until she left MCCS. Washington testified that MCCS received a referral about J.S. in January 2016, "due to domestic violence between the parents," and that at that time MCCS provided "supportive in-home services for the mother and father to maintain the child in the home, because it was an alternative response case." Washington testified that when she was assigned to the case there was a family services plan in place. Pursuant to the plan, "there was to be involvement with domestic violence and anger management for [Father]; and domestic violence awareness and training with Artemis for [Mother]. There was housing on the family support plan, and the medical things that [J.S.] needed. Because at that time it was believed that he had cerebral palsy." At the time, Washington testified that both parents were completing parenting classes, and Father "was involved with South Community, which he had continued to be involved with for the duration of the case while I had the case, and prior to me receiving the case." Washington testified that J.S. was "involved with Help Me Grow and PACE."

{¶ 32} Washington testified that she "got the case on a Monday, and I removed the child on Friday, the 23rd of September, 2016." She testified that Father called her on

Wednesday and said "the baby needed to be removed from the home. I asked [Father] if there was any way that he could go to the shelter and take the baby with him, because we would support him in the shelter. And he said no, he couldn't do that, that we needed to remove the baby." Washington testified that Father told her that Mother "wasn't following the recommendations that the nurse had made regarding feeding the baby, because he wasn't gaining weight," that Mother called J.S. an offensive name, and that "she had struck the baby, and generally, she just could not take care of the baby." Washington testified that J.S. lost four pounds in a month and was "not on target or task. * * * But I just figured him not being able to move was related to the cerebral palsy."

{¶ 33} Washington testified that MCCS received full temporary custody of J.S. around December 2016. Washington testified that two of Father's other children had been placed in the permanent custody of MCCS, and that at the time of removal Father had been convicted of domestic violence. She stated that the similarities between the removal of Father's other children and the removal of J.S. "were the [domestic violence] was still involved. He had been convicted of DV in the case of [the two other children]. And there had been some indication of alleged sexual abuse in that case too." Washington testified that a psychological evaluation of Father had been completed in the prior cases, and Father "had been evaluated in 2010, and he had been found to have borderline personality disorder, narcissistic disorder, a schizoidal type disorder * * *." She stated that Father received treatment recommendations similar to Bromberg's at the time. Specifically, she testified as follows:

> The treatment recommendations that carried over were that [Father] should have drug and alcohol treatment for at least 24 months; parenting

care and treatment for at least 24 months; that he should be involved with a mental health provider for at least 24 months * * *[.] There were several things that carried over from Doctor King's assessment that bled into Doctor Bromberg's assessment.

{¶ 34} Washington testified that J.S. was in B.K.'s foster home during the entirety of her involvement with the child. Washington testified that Mother and Father initially attended J.S.'s weekly physical therapy and speech appointments, but that they were eventually asked to stop attending. Washington testified that after she became involved, she developed a case plan to address the concerns that led to J.S.'s removal, and that the goal was to return J.S. home.

{¶ 35} Washington testified that in August 2017, "Mother and Father were in jail in Boone County, West Virginia, because father had been pulled over for some minor traffic violation. And when he was pulled over, he gave a false identity."

{¶ 36} After discussing Mother's case plan objectives and testifying that she failed to substantially complete them, Washington discussed Father's case plan objectives. Washington testified that Father agreed to work on his case plan objectives, which were to have suitable housing, verifiable income, a parenting and psychological assessment, complete domestic violence and anger management programs, counseling and therapy, and visit J.S. She stated that in September 2016, when Father was homeless, she gave Father a list of available housing as well as shelter information. She stated that Father found housing a month later, and that she last visited Father's home in August 2017 in Trotwood. She testified that the one-bedroom apartment was safe and appropriate, and that his housing objective was complete at that time.

**{¶ 37}** Washington testified that Father told her he was self-employed and had his own company, but "had been unable to provide me with any documentation to prove that he was self-employed." She stated that Father once provided pay stubs in the name of E.B., and that she suggested that he gave her the wrong pay stubs, "because you gave me [E.B.'s] pay stubs. And he said no, I'm [E.B.]." Washington testified that she told Father, "this is an alias. I cannot use an alias for your pay stubs." Washington stated that he never provided accurate pay stubs. She stated that Father also received $425 a month to provide maintenance at his apartment complex, and that his rent there was $400. She testified that $425 was not sufficient income for him and J.S. Washington testified that she referred Father to "Staffmark in Huber Heights and other temporary agencies for employment," but that he did not follow through. Washington testified that Father's income objective was not complete.

**{¶ 38}** Washington testified that she included the parenting/psychological evaluation on the case plan to see if Father had experienced improvement over the six-year period since he was evaluated by Dr. King. She stated that he completed the evaluation with Dr. Bromberg. Washington stated that when she became involved, Father was engaged with South Community to address Dr. King's recommendations. Washington reviewed Bromberg's 24-month treatment recommendations for Father, including specialized therapy for personality disorder. Washington testified that she referred Father to "Fatherhood Initiative" in May 2017, but that Father did not follow through. She stated that he completed "Promoting First Relationships" at MCCS in September 2016, but that alone was not sufficient to meet the parenting skills training case plan objective. Washington testified that "Mother and [F]ather attended the class

together. And while in that class, again, Mother yelled at the child with no redirection from the father, and she struck the child with no redirection or correction from the father."

**{¶ 39}** Regarding the individual psychotherapy that Bromberg recommended, Washington testified that she referred Father to the Ellis Institute for cognitive behavioral therapy and dialectical behavioral therapy, and that Father did not follow through or engage in those therapies elsewhere. She stated that Father felt that his longstanding therapy at South Community was sufficient, but that MCCS did not believe it was sufficient to meet his case plan objective. She stated that Father has not completed his individual psychotherapy case plan objective.

**{¶ 40}** Regarding Father's anger management and domestic violence case plan objective, Washington testified that she referred Father to "Chapman Services," and that Father did follow through but did not complete the program, and that this case plan objective was not complete.

**{¶ 41}** Washington testified that "there had never been any indication that [F]ather was using any drugs while I had the case," and that she considered the substance abuse case plan objective to be complete.

**{¶ 42}** Regarding visitation, Washington testified that while Father's visitation was increased from two hours per week supervised to four hours per week unsupervised, it "was decreased back down to two hours and it was made supervised, again, after it was discovered that father was bringing [M]other to visitations and she was hiding in the vehicle outside." Washington stated that she observed a few of the visitations, and that Father would "play with [J.S.] for a little while, and then he would pull out his phone and be on his phone for a little while. * * * He would feed [J.S.], but he was always - - he

always had that phone out." She stated that Father "was always redirected with the phone, and to engage the baby." Washington stated that Father visited J.S. consistently, but that as of October 4, 2017, the case plan objective was not met.

{¶ 43} Washington stated that two of Mother's sisters were suggested as placements for J.S., but one of them decided that "[J.S.'s] care would be too much for her," and the other was disqualified due to her criminal history and background. She stated that Father provided his own brother's contact information, but the brother indicated that "he would like to adopt [J.S.], but he wasn't willing to be a foster parent or an interim parent until [Father] and [Mother] could get it together."

{¶ 44} Washington testified that she did not believe that J.S. could be reunified with Father in the foreseeable future. She testified as follows:

> [Father's] mental health disability does not allow him the insight that it takes to parent. He doesn't believe that the way he handles [Mother], that there is anything wrong with that. He has a continuing history of * * * abuse towards his female partners. He was even incarcerated for domestic violence and is a convicted felon * * * due to that fact. He * * * does not realize - - and this may be due to his personality disorder, that he cannot parent [J.S.] effectively.

{¶ 45} Washington stated that J.S. is adoptable, and that a grant of permanent custody in favor of MCCS was in the child's best interest because he "will be cared for; he will be safe; he will get the care and provision that he needs; and he will continue to thrive and do well placed independently of his parents."

{¶ 46} On cross examination by counsel for Father, Washington testified that she

"found out that some of the things that [Father] told me [about his treatment at South Community] were not the truth. Because he had also told me that he was receiving domestic violence training through them, and anger management therapies through South Community, but that wasn't true." She stated that Father only missed visitation during his brief incarceration.

{¶ 47} On cross examination by the GAL, Washington testified that Father and Mother have a "very volatile relationship. And this very court ordered that their visits be separate for that reason." She stated that "for [Father] to bring [Mother] to the Agency and hide her in the vehicle, it was deceptive and very frightening. Because if they got into a fight with [J.S.], he could be injured." When asked why she sought permanent custody instead of an extension of temporary custody, she responded that the parents "have an established history of being domestically violenced [sic] toward each other, of being aggressive and hostile and demeaning * * *. * * * [Mother] will disclose it eventually that they've had a fight, or that [Father] hit her, [Father] slapped her, [Father] punched her, [Father] had warrants out for his arrest. It was just a continuing, ongoing thing with them." She stated that "neither one has the ability or insight to understand how they impact [J.S.'s] life by their relationship." Washington testified that J.S.'s special needs affected her decision to seek permanent custody rather than an extension because "he's going to need special care for the rest of his life. The way he was raised is going to impact him for the rest of his life."

{¶ 48} Robert Brun testified that he was J.S.'s current caseworker at MCCS, having been assigned to his case since November 2017, when J.S. was placed with his current foster family. Brun stated that J.S. had been in MCCS's care since September

23, 2016, and that J.S. had been placed in foster care with a married couple who had one four-year-old child. He stated that all of J.S.'s needs were being met at the foster home, and J.S. has speech and physical therapy twice a week. Since Brun became involved in the case, the parents had not participated in J.S.'s appointments, because there had been some problems with the former foster family when the parents were at appointments.

{¶ 49} Brun stated that Father lost his housing in January 2018 and slept in a men's shelter "off and on." Brun testified that Father reported he was allowed to sleep at a warehouse where he stored his tools, but it was "not a place for a child." According to Brun, Father was "always in the process of finding a place" and his housing objective had not been met.

{¶ 50} Brun stated that Father was "basically self-employed, [with] a company of his own" providing property maintenance. According to Brun, Father always claimed to be working, but Brun had not "actually seen any pay stubs or anything to verify such." Brun testified that Father was "very resourceful. I'm sure he could support [J.S.]. * * * I haven't been able to verify it, but I don't question his ability to make money." Brun stated that Father's income objective on his case plan was "ongoing."

{¶ 51} Brun testified that he had concerns about Father's domestic violence issues. The first time Brun spoke to Mother, Mother reported that Father had hit her. He testified that Father and Mother "kind of go back and forth taking protection orders against each other. And then, you know, the next time I would see them, they would be together. At the last visit last Wednesday, they came together." Brun stated, "whether they live together, I can't really testify to. But I do know * * * they're with each other a

lot." He stated that, although Father had completed the August Project prior to Brun's involvement, Brun did not consider the objective completed, since Father failed to demonstrate that he learned from the program.

{¶ 52} Brun stated that J.S.'s current foster family was "willing and able" to adopt him, and that if MCCS received permanent custody, J.S.'s case would be transferred to the adoption unit of MCCS. Having observed J.S. and his foster family, Brun testified that they were bonded to each other. Brun stated that MCCS believed that J.S. could not be reunified with Father in the foreseeable future due to his lack of suitable housing, "some issues with domestic violence," lack of verifiable income, his past history of having two children removed from his care in the context of domestic violence, and his failure to complete his case plan objectives. Brun stated that permanent custody in favor of MCCS was in J.S.'s best interest.

{¶ 53} On cross examination by counsel for Father, Brun acknowledged that Father has been going to "On My Shoulders" fatherhood classes since January 8, 2018, and that Father "found that on his own, which is good on his part." Brun stated that Father also went to "Mahajan Therapeutics" "on his own, again, to his credit," and that he provided documentation that the DBT group at Ellis Institute was only offered to women there, but that Mahajan Therapeutics offered the program to men.

{¶ 54} On cross examination by the GAL, Brun stated that he became aware that Father was involved with "Mahajan Therapeutics" in November 2017; Brun did not know how many sessions Father had had or how often he attended. He stated that Father lost his housing because "he became unemployed by the landlord, so he was no longer able to stay there." Brun stated that J.S.'s foster parents were fully committed to him and fully

qualified to care for him.

{¶ 55} Kimberly Bayless testified that she had been employed by MCCS as a supervisor since 2008; in October and November 2017, she actively handled J.S.'s case until it was assigned to Brun. According to Bayless, Mother and Father were "either broken up, [or] they're back together. Dad normally denies being with Mother. Mother normally tells that they are together. Just as recent as this morning * * * [M]other said that she and [Father] were living together," and Mother also stated that she was pregnant by Father. According to Bayless, "throughout the life of the case * * * Dad is calling and complaining on mom. Mom is saying dad's hitting her." Bayless acknowledged that the parents had completed some recommendations but they did not follow through with what they learned. She stated that the parents have had "nine orders of protection that they've taken out against one another in little under a year. They violate them. They stop them. They don't go to court. They take another one out * * * it's both parents." According to Bayless, "it's never really been about [J.S.], it's been about [F]ather not wanting [M]other to have him. * * * It's a narcissistic behavior." When asked if granting permanent custody of J.S. to MCCS was in his best interest, Bayless responded, "Absolutely." She testified that J.S. "lacked attention prior to coming into the Agency, and I feel that he would go back to that same spot. Because the relationship is what's most important to mom and dad, whether they deny it or not. It's not J.S."

{¶ 56} Counsel for Father called Andrew Siegler to testify on behalf of Father. Siegler was an adult outpatient therapist at South Community Behavioral Health, who had treated Father for at least two years. Siegler stated that when he began treating him, Father "was having a lot of anger issues and working through some past trauma from his

time in the military." Siegler stated that "per [Father's] report, he's making progress in managing his frustration, anger, response to triggers." Siegler stated that "disruptive mood regulation disorder" was the only diagnosis that he was aware of Father receiving, and that his treatment was based upon that diagnosis. Siegler then stated that Father told him in preparation for the hearing that he was diagnosed with "a personality disorder," but that "we didn't feel that that was accurate between us, just based on what he was reporting and what I observed in session with him."

{¶ 57} Finally, Father testified that he resides "at a warehouse that I store my materials and stuff in due to an incident with my prior landlord." Father stated that "we had a disagreement because he wanted me to cover up some mold inside a wall. * * * So he eliminated by employment and my residence due to not wanting to break the law." Father testified that if he received custody of J.S., he would "contact Hope and Homeful[l]. They have a homeless shelter for families. * * * I would be able to get into that. I would be there probably two or three weeks and they would help me find a residence." Father stated that he was "having a hard time getting another place because I made my prior landlord evict me because I felt he owed me for all the stuff I had done for him."

{¶ 58} Father testified that he had owned his own business since 2012, and that it had "an A-plus rating" with the Better Business Bureau. He stated that he was currently "taking care of" two strip malls in the Dayton area and that he and the owner of the properties had "a verbal agreement - - we haven't signed no papers yet - - that he will be paying me two thousand dollars a month plus space to sell stuff that I get out of my cleanouts." Father testified that he was also "doing work for the bank through Northside Management out of Arizona. What they do is they give me work orders. I go do the

work orders. It's everything from changing locks on housing that the bank has taken back from people, cleaning them out, cutting the grass, removing snow. * * * They send me a check every week on Wednesday." Father stated that he worked seven days a week.

{¶ 59} Father stated that he did provide income verification to his former caseworker, Patrice Washington; according to Father, "the paperwork" was in the name of K.B., his ex-wife, (not E.B.) because she had no felony history, and K.B. "was fine with me putting everything in her name." Father stated that he owned a 2003 Chevy Astro van with a car seat for J.S.

{¶ 60} Father testified that he was halfway through the Fatherhood Initiative program. He stated that he "wasn't getting no help from Children Services for this DBT [dialectical behavior therapy]. I asked Ms. Bayless at the last hearing if she could help me get something. She said, 'We've already filed for permanent custody, we ain't doing nothing for you.' " Father stated that he "went out and I found Cordell and Associates that's willing to give me classes, but their next classes don't start until the end of March, beginning of April, because of the holiday. I do got an appointment with them the end of March to be re-evaluated to see if I even have to go through their class." When asked about Mahajan Therapeutics, Father responded, "Don't even know who that is."

{¶ 61} Father stated that he had PTSD "really bad" from when he served in Iraq. He stated that Mother "will text me and pretty much beg me to come back everyday on my phone * * *. And, you know, I don't need that stress any more." Father stated that he took 15 medications at night and two medications in the morning, "[j]ust to keep [him]self going." Father denied that he and Mother were in a relationship, but he stated that they

had been "talking."

**{¶ 62}** Father testified that he wanted custody of J.S. and that "whatever the Courts tell me I've got to do, I will do to the fullest." Father stated that he talked to his psychiatrist "about this personality disorder that everybody is saying I've got. She says 99 percent of people that take these tests is going to come up with some kind of personality disorder, because nobody is perfect."

**{¶ 63}** On cross examination by the GAL, Father denied that he was responsible for Mother's current pregnancy. He testified that he could not get a bank account "due to having checks out when my bank accounts were cleaned out," so he was in the process of "fixing all of that with the bank so I can get a bank account again." When asked about J.S.'s ongoing developmental delays, Father stated that he felt "bad about it, because I feel maybe I should have been at home more, and maybe I could have helped him more. But I was out there doing what a father should do and making money to support my family." Father acknowledged that he probably had five convictions on his record involving dishonesty, and that he had been to prison three times.

**{¶ 64}** In response to a question by the court at the conclusion of Father's testimony, the GAL recommended permanent custody be granted to MCCS.

**{¶ 65}** On February 23, 2018, the magistrate issued a decision concluding that, in accordance with R.C. 2151.414(E), there was clear and convincing evidence that the child could not and should not be placed with either parent in a reasonable time and that, in accordance with R.C. 2151.414(D), there was clear and convincing evidence that the commitment of the child to the permanent custody of MCCS was in the child's best interest.

**{¶ 66}** On March 6, 2018, Father filed objections to the decision of the Magistrate and indicated that he would supplement his objections upon receipt of the transcript. Father supplemented his objections on August 27, 2018. Specifically, Father objected to the following findings of fact that formed the basis for the magistrate's conclusions: he did not make enough income to adequately support the family or employment was not able to be verified by the caseworker; he did not complete Dr. Bromberg's recommendations; he did not have housing; he did not engage in dialectical behavior therapy (DBT); he did not complete the program for Anger Management with Chatman [sic] Services;[2] he did not complete the program for Domestic Violence Education with Chatman [sic] Services and allowed mother to yell at the child without intervention.

**{¶ 67}** Father argued that, at the time of permanent custody determinations, reunification with Father was possible; "[t]estimony from the caseworker, the GAL, expert witness and [F]ather, clearly established that [F]ather had substantially completed, or was in progress on all of his case plan objectives * * *." According to Father's objections, "clear and convincing evidence was elicited which demonstrated that the child was bonded to his father." Father argued that he "demonstrated motivation and a desire to improve. Given the great strides [F]ather made in his case plan throughout the pendency of this matter, the finding of permanent custody was not supported as he was able to reunify with his child in the foreseeable future."

**{¶ 68}** On October 5, 2018, MCCS filed a reply to the supplemental objections, which provided in part as follows:

Father's case plan is not complete. * * * Due to [F]ather's lack of

---

[2] Caseworker Washington testified about a referral to "Chapman Services."

housing, continued domestic violence with Mother, his preoccupation with his relationship with Mother over the child, his lack of understanding of the child's limitations and the proper care for the child, and his lack of change in behavior despite the numerous services Father engaged in during this case, MCCS does not foresee him completing the case plan objectives in the following six months. * * *

MCCS asserted that the magistrate properly found that statutory factors in R.C. 2151.414(E) supported the termination of parental rights and that granting permanent custody to MCCS was in J.S.'s best interest.

{¶ 69} Based upon the evidence presented at the dispositional hearing, the juvenile court overruled Father's objections, determined that the factors set forth in R.C. 2151.414(E)(1), (2), and (11) existed and supported granting permanent custody to MCCS, and found that pursuant to R.C. 2151.414(D), the grant of permanent custody to MCCS was in the child's best interest.

{¶ 70} Father asserts one assignments of error herein as follows:

THE TRIAL COURT ERRED IN FINDING THAT THERE WAS CLEAR AND CONVINCING EVIDENCE THAT THE CHILD CANNOT OR SHOULD NOT BE PLACED WITH FATHER IN A REASONABLE TIME.

{¶ 71} Father argues that the trial court erred in finding that the factors set forth in R.C. 2151.414(E)(1), (2), and (11) applied in his case. Father asserts that the "fears expressed by [him] and Help me Grow as to the care and fragility of the child were substantiated by his progress and weight gain while in MCCS custody." Father acknowledges that he had two children placed in the permanent custody of MCCS

between 2009 and 2014, but he maintains that he made progress since that time. Father asserts that "Dr. Bromberg testified that Father could parent the child in the foreseeable future with the appropriate treatment. * * * Specifically, Dr. Bromberg testified that Father could understand parenting skills for the child with education over a period of twelve months." He asserts that, additionally, "Dr. Harris felt that the child could be placed with Father with * * * recommendations in place, with an addition of protective services from MCCS." According to Father, "Dr. Harris testified that six months of personality disorder therapy would be sufficient to reunify J.S. with his father." Father asserts that he "has done well and progressed" through his treatment at South Community, and that he was making substantial progress on the mental health component of his case plan even prior to the formal complaint filing in this case.

{¶ 72} Father asserts that, despite "what his long-time provider at South Community was telling him," he "sought assistance from MCCS in seeking the sort of treatment they think he needs," but was denied assistance. Father asserts that while "MCCS provided testimony that there are ongoing domestic violence issues between the parties, * * * such testimony corroborated that Mother is usually either untruthful regarding the circumstances, or is often the alleged perpetrator."

{¶ 73} Father further asserts that "MCCS caseworker Robert Brun testified that he did not question Father's ability to support J.S., and he did not question Father's self-employment through operating his own business." Father asserts that he had suitable housing for the majority of the case, that he lost housing due to a disagreement with his landlord, and that he "had a plan with a homeless shelter for immediate use should the child be returned to his care, with facilitation of obtaining more permanent housing

through that facility soon thereafter." Father also consistently visited J.S. According to Father, despite his "ongoing progress and professional testimony that he is able to parent given appropriate treatment of as little of six months, MCCS represented that it did not believe Father's mental health concerns would <u>ever</u> allow him to parent the child."

{¶ 74} Citing R.C. 2151.414, Father argues that the "only possible application of this statute in this case would be the potential for R.C. 2151.414(B)(1)(a): whether J.S. could not be placed with either parent within a reasonable period of time OR should not be placed with either parent if one of the R.C. 2151.414(E) factors are present. The court erred in finding that both applied." According to Father, the "trial court's focus on the negative evidence failed to factor in all relevant evidence in accordance with the statutory mandate."

{¶ 75} Regarding R.C. 2151.414(E)(1) (whether Father had remedied the problems that caused the child to be placed outside the home), Father argues that, while the trial court "discussed [his] history of mental health issues, difficulty in providing documentation of income, his lack of adequate housing, and domestic violence allegations," the court failed to discuss his efforts to remedy all of these concerns, particularly given the very short window of time between the removal of the child (September 2016) and the filing of the complaint for permanent custody (July 2017). Father asserts that "only one of these issues was a [f]actor as to why the child was removed from his care – i.e. domestic violence allegations."

{¶ 76} Father argues that he had been involved in cognitive behavioral therapy at South Community for years and had been engaged with mental health treatment as diagnosed by providers there. He argues that, when he understood that MCCS wanted

him to have more aggressive treatment, he "sought to follow through on those referrals." Father asserts that he attended domestic violence and anger management programs and parenting classes, had been working throughout the time the case was pending, and had made substantial efforts to remedy issues related to mental health and associated domestic violence.

{¶ 77} Father asserts that he "demonstrated an ability to bring in income," which was verified by caseworker testimony. Furthermore, while Father "did not have ideal housing at the time of the hearing, he had resources ready to provide for the child." According to Father, "MCCS was fine with Father living at a homeless shelter at the onset of the case, therefore that was not a condition he failed to remedy pursuant to the statute." Father asserts that the progress he made "was cut short by the early filing" for permanent custody.

{¶ 78} Regarding R.C. 2151.414(E)(2) (parent's chronic mental or emotional illness or other conditions so severe as to make parent unable to provide an adequate home for the child presently or, as anticipated, within one year), Father asserts that the court discussed Bromberg's and Harris's recommendations in considering this factor. He notes that "Dr. Harris discussed Father being able to parent the child in as soon as six months, and Dr. Bromberg testified that Father would have the ability to demonstrate appropriate parenting skills in twelve months." He argues that the trial court ignored this evidence and focused on the need for continuing mental health treatment over a 24-month period. Father asserts that this focus was contrary to weight of the evidence, because his treatment could continue while he parented the child – as testified to by two mental health professionals.

**{¶ 79}** Finally, regarding R.C. 2151.414(E)(11) (parent had parental rights terminated with respect to another child), Father asserts that the court failed to evaluate the evidence he provided that, notwithstanding the prior termination of his parental rights with respect to other children, he could provide adequate care for J.S. According to Father, the court should have considered the progress Father had made to ensure the health, welfare, and safety of his child "before simply applying this portion of the statute as a bar to reunification." Father asserts that, because the R.C. 2151.414(B) requirement was not met, he need not argue the child's best interest, as both factors must be present pursuant to statute.

**{¶ 80}** MCCS responds that, despite multiple opportunities to do so, Father failed to demonstrate that he had in any way remedied the issues that existed at the time of J.S.'s removal; therefore, the trial court did not err in finding that R.C. 2151.414(E)(1) applied. MCCS argues that, since Father had even started specialized treatment for his personality disorders by the time of trial, and "the treatment carried a minimum term of two years," the trial court did not err in finding that his mental illness was severe enough to prevent Father from providing an adequate home for J.S. within one year of the custody trial. MCCS argues that, once it established that Father had lost custody of other children, he had the affirmative burden to provide clear and convincing evidence that he could, nonetheless, provide J.S. with a secure home and could adequately provide for his care; Father failed to provide such evidence. MCCS argues that "by the time of trial, Father had no housing that would have been appropriate for a child, had no verifiable income, had been accused of two incidents of domestic violence against Mother during the pendency of the case, and had not demonstrated that he was motivated to address

his mental-health issues." Finally, MCCS asserts that the trial court correctly ruled that there was clear and convincing evidence that granting permanent custody to MCCS was in J.S.'s best interest.

{¶ 81} As this Court has noted:

In Ohio, R.C. 2151.414(B)(1) authorizes a juvenile court to terminate parental rights and grant permanent custody to a state agency upon a finding, by clear and convincing evidence, that permanent custody in is a child's best interest and that the child * * * cannot be placed with a parent with a reasonable period of time or should not be placed with either parent. (R.C. 2151.414(B)(1)(a)).

"Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven." *In re Dylan C.*, 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist.1997). "An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof." *Id.* (Citation omitted.) "When a judgment is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *In re Conner*, 2d Dist. Montgomery No. 18808,

2001 WL 1345955, at *1. (Citation omitted.) "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the [judgment].' " *Id.* (Citation omitted.)

*In re A.J., Jr.*, 2d Dist. Montgomery No. 27808, 2018-Ohio-1052, ¶ 13-14.

**{¶ 82}** R.C. 2151.414(E) provides:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have

substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 83} We conclude that the trial court's judgment granting permanent custody of J.S. to MCCS was supported by clear and convincing evidence. The evidence adduced

at the hearing established that J.S. could not be placed with Father within a reasonable time or should not be placed with Father. The record reflects that MCCS provided reasonable case planning (after attempting to maintain J.S. at home with supportive in-home services) and diligent efforts to assist Father, but that Father was unsuccessful in completing his case plan objectives and in significantly changing his conduct to allow him to resume and maintain parental duties pursuant to R.C. 2151.414(E)(1). Despite the presence of the supportive in-home services, Father indicated to caseworker Washington that he could not care for J.S. Washington testified that, in 2010, Father was evaluated and diagnosed by Dr. King with borderline personality disorder, narcissistic disorder, and a "schizoidal type" disorder, and that when she became involved in the instant matter, Father was receiving treatment at South Community as a result of King's recommendations.

{¶ 84} While Washington referred Father to the Ellis Institute for the specific therapies recommended by Bromberg, Father did not follow through because he believed his treatment at South Community was sufficient. Father did not ask for assistance in obtaining the specialized treatment until the first day of the dispositional hearing. Siegler, Father's therapist of at least two years at South Community, was only treating Father for "disruptive mood disorder." Father only told him in preparation for the hearing that he had been diagnosed with "a personality disorder." Much of Siegler's opinion appeared to be based upon what Father self-reported to him, and Bromberg testified that Father was reluctant to reveal personal information.

{¶ 85} Father's only verified income was $425 per month from his apartment complex, which he no longer received, and which Washington testified was insufficient.

Despite his testimony about the success of his business and his further employment through the bank, pursuant to which he stated he was paid by check every week on Wednesday, Father failed to verify this income. Washington testified that Father failed to follow up on her referral to "Staffmark" for employment.

{¶ 86} Despite attending parenting classes, Father failed to intervene in a parenting class when Mother yelled at and struck J.S. B.K., J.S.'s first foster mother, testified that J.S. was not demanding and required proactive care to anticipate and meet the child's needs, and Washington testified that Father had to be repeatedly redirected to put his phone away and engage with J.S. during visitation.

{¶ 87} In August 2017, Washington testified that Father, who acknowledged five previous convictions for offenses of dishonesty, was arrested for providing a false identity in West Virginia. Harris testified to his concern that Father failed to reveal to him that J.S. had special needs. Further, Father was deceptive when he brought Mother to his visitations, exposing J.S. to a risk of harm from their volatile relationship. Washington testified that Father was untruthful with her about the therapy he received at South Community. She further testified to Mother's and Father's "established history" of domestic violence that is "continuing, ongoing." She testified that Father failed to realize that he could not effectively parent J.S.

{¶ 88} Brun testified that Mother's and Father's attendance at J.S.'s appointments had to be discontinued because of problems between them and the foster family. Father was homeless at the time of the hearing. Despite their volatile and violent relationship, Mother indicated to Washington that she was pregnant with Father's child at the hearing, while Father denied responsibility for her pregnancy. Brun testified that Father failed to

complete his domestic violence objective. Caseworker Bayless testified that Father had never prioritized J.S.'s needs. Washington and Brun testified that J.S. could not be reunited with Father in the foreseeable future. Based upon the foregoing, we conclude that the trial court correctly found that Father failed continuously and repeatedly to substantially remedy the conditions causing J.S. to be placed outside the home, and that R.C. 2151.414(E)(1) was applicable.

**{¶ 89}** Regarding R.C. 2151.414(E)(2), we conclude that Father minimized much of Bromberg's and Harris's testimony regarding his mental and emotional health and his ability to provide an adequate permanent home for J.S. Bromberg testified that the Personality Assessment Inventory test revealed "some severe personality problems." J.S. was a special needs child due to his parents' neglect, and Bromberg testified he was concerned about the possibility of J.S.'s neglect in Father's care. Bromberg stated that Father's "lie score" of 10 on the Child Abuse Potential test exceeded the cut-off of seven, and that accordingly, "we can't determine whether he has any characteristics similar to known, active physical child abusers." Bromberg diagnosed Father with impulse disorder, personality disorder, some substance use disorders, and amphetamine disorder, all of which he stated could affect Father's ability to parent. He testified that "the particular features that were seen most prominent, one of which was avoidant, would suggest the potential for neglect."

**{¶ 90}** On cross examination, Bromberg testified that *if* Father applied himself to the 24-month recommended treatment regimen and was *very aggressive*, there would be *a chance* of improvement sufficient to *consider* reunification. He stated that the treatment could conceivably last "as much as five to ten years." Bromberg testified that Father's

Personality Assessment Inventory suggested a lack of motivation for treatment. Bromberg stated that, in 47 years, he had "never seen anybody effectively treated for personality disorder," and that his recommended treatment provided *hope* but "[w]e don't have follow-ups to the remissions."

{¶ 91} Due to his special needs, J.S. requires patience, consistency, understanding, and acceptance, and Harris testified that Father lacks "a well-defined coping style," and that he can be unpredictable in his behavior. He testified that Father had difficulty with the demands of everyday living and could form mistaken impressions. He further testified that Father had oppositional tendencies, including anger and resentment to authority figures, leading to poor judgment. According to Harris, Father failed to anticipate the consequences of his actions. Harris described Father as close-minded and inflexible, qualities that he stated would interfere with Father's ability to parent. He stated that Father would "have limited skills in tolerating demands that children often make on their parents." Like Bromberg, Harris testified that if his recommended treatment regimen were followed, Father "*might*" be able to care for J.S. At the time of the hearing, Father was not following the recommended 24-month treatment regimen of either expert, and he minimized the seriousness of his multiple diagnoses, noting that "nobody is perfect," and that he planned to "be re-evaluated to see if I even have to go through their class." We accordingly conclude that the trial court correctly found that R.C. 2151.4141(E)(2) was applicable, since Father's multiple diagnoses make him unable to provide an adequate permanent home at the present time and, as anticipated, within one year of the hearing.

{¶ 92} It is undisputed that Father previously had his parental rights terminated,

and based upon the foregoing, we conclude that Father failed to "provide clear and convincing evidence to prove that, notwithstanding the prior termination, that [Father] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of [J.S.]." In other words, the trial court correctly found R.C. 2151.414(E)(11) applicable.

{¶ 93} Finally, although not argued by Father, we conclude that the trial court correctly determined that the grant of permanent custody in favor of MCCS was in J.S.'s best interest pursuant to R.C. 2151.414(D), which provides as follows:

> (1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the

temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 94} The record reflects that J.S.'s interactions and relationship with Father weighed in favor of the grant of permanent custody to MCCS, since Father could not provide a secure legal placement for J.S. J.S. was thriving in his foster home, where his special needs were being met, and his foster family had expressed a desire to adopt him, all of which further supported the termination of Father's parental rights in favor of MCCS. J.S. needed a legally secure placement, and that type of placement could not be achieved without a grant of permanent custody to MCCS. Finally, as noted above, R.C. 2151.414(E)(11) applied in relation to Father and J.S.

{¶ 95} For the foregoing reasons, Father's assigned error is overruled, and the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Sara M. Barry
Jeffrey D. Livingston
Jeffrey T. Gramza
Hon. Helen Wallace